

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FAIR HOUSING JUSTICE CENTER, INC.,

                          Plaintiff,

            v.

ESPLANADE VENTURE PARTNERSHIP;
ESPLANADE OF WHITE PLAINS VENTURE
PARTNERSHIP; PALISADES GARDENS
GROUP, LLC; ESPLANADE CHESTNUT, LLC;
CHESTNUT OPERATING COMPANY, LLC;
and ESPLANADE STATEN ISLAND, LLC.,

                       Defendants.

---

13 Civ. 3600 (AT) (RLE)

**AMENDED COMPLAINT**

Plaintiff Fair Housing Justice Center, Inc. ("FHJC") by its attorneys, Emery Celli

Brinckerhoff & Abady LLP and MFY Legal Services, Inc., for its Complaint against Defendants

Esplanade Venture Partnership; Esplanade of White Plains Venture Partnership; Palisades

Gardens Group, LLC; Esplanade Chestnut, LLC; Chestnut Operating Company, LLC; and

Esplanade Staten Island, LLC (collectively the "Defendants") alleges as follows:

### INTRODUCTION

    1.    The owners and operators of five senior residences, referred to as The

Esplanade Residences and consisting of more than 600 apartments in buildings with elevators

located in New York City and its northern suburbs, discriminate against prospective and current

residents because of their disabilities. The Esplanade Residences' policies include requiring

residents who use wheelchairs to eat in a separate dining room, refusing to rent to those who use

motorized wheelchairs, restricting seniors who use wheelchairs to first floor apartments, and/or

refusing to rent to seniors who use any type of wheelchair. The Esplanade Residences also

routinely subject prospective residents to intrusive and discriminatory medical inquiries as a pre-condition to renting an apartment.  These policies were aptly described by one site's Director of Marketing in 2012, when she explained that new residents "have to come in vertical, ambulatory."

2.      All five sites use a common application form that inquires about a prospective tenant's disabilities and religion, including whether applicants are "currently practicing" their religion.  Employees openly state that most of the residents at the communities are Jewish seniors and one has described life there as being like "the Jewish hotel experience."

3.      To add insult to injury, The Esplanade Residences' marketing materials, including websites and brochures, contain more than 200 human models used to depict only white residents.  In sharp contrast, the human models used by Defendants to depict employees in the same marketing materials include non-white and white human models.  This racially exclusive marketing campaign indicates a preference by Defendants for white residents.

4.      Although it has been well settled for decades that such conduct violates federal, state, and local fair housing laws, the owners of The Esplanade Residences, openly ignoring their legal obligations, deny equal housing opportunity to seniors throughout the New York City metropolitan area because of disability, religion, and race.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. § 2201, and 42 U.S.C. § 3613.  This Court has supplemental jurisdiction over the New York State law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because five of the six defendants, Esplanade Venture Partnership, Esplanade of White Plains

Venture Partnership, Palisades Gardens Group, LLC, Esplanade Chestnut, LLC and Chestnut

Operating Company, LLC - are incorporated and conduct business in this District. Defendant

Esplanade Staten Island, LLC is incorporated and conducts business in Richmond County in the

State of New York.  In addition, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2)

because a substantial part of the events giving rising to the claims occurred in this District.

**THE PARTIES**

7.     Plaintiff FHJC is a non-profit organization dedicated to ensuring that all

people have equal access to housing opportunities in the greater New York City region by

eliminating housing discrimination and creating open, accessible, and inclusive communities.

The FHJC's principal office is located in the Southern District of New York.

8.     Among other things, the FHJC, a) provides information to the public and

other nonprofit organizations in the New York City regional area about fair housing laws, b)

provides intake counseling to individuals and organizations with allegations of housing

discrimination, c) conducts testing and other investigations of allegations of housing

discrimination, d) makes legal referrals to cooperating attorneys, e) assists with the preparation

and filing of administrative housing discrimination complaints, and f) provides post-referral

litigation support services.  The FHJC provides these services free of charge and without regard

to income.

9.     The FHJC also conducts testing investigations for government law

enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair

housing enforcement activities, and engages in policy initiatives that further the FHJC's mission,

including the publication and dissemination of reports and educational materials.

10.     The FHJC employs individuals as "testers," who are persons that pose as

renters or homebuyers for the purpose of obtaining information about the conduct of local

governments, landlords, real estate companies, agents, and others to determine whether illegal housing discrimination is taking place.

11.     The FHJC expended staff time and other resources to investigate and respond to Defendants' discriminatory operation of their residences, which diverted resources away from other FHJC activities.

12.     Defendants' discriminatory practices frustrated the FHJC's mission to ensure that all people have equal access to housing opportunities in the greater New York City region by, among other things, making housing unavailable because of disability, religion, and race.

13.     Upon information and belief, Defendant Esplanade Venture Partnership is the owner and lessor of The Esplanade Manhattan, which is located in the District in New York County at 305 West End Avenue, New York, New York 10023.  Upon information and belief, Defendant Esplanade Venture Partnership is a New York partnership doing business in the District.  Upon information and belief, The Esplanade Manhattan has approximately 160 rental apartments.

14.     Upon information and belief, Defendant Esplanade of White Plains Venture Partnership is the owner and lessor of The Esplanade White Plains, which is located in the District in Westchester County at 95 South Broadway, White Plains, New York 10601. Upon information and belief, Defendant White Plains Venture Partnership is a New York partnership doing business in the District.  Upon information and belief, The Esplanade White Plains has approximately 160 rental apartments.

15.     Upon information and belief, Defendant Palisades Gardens Group, LLC is the owner and lessor of The Esplanade at Palisades, which is located in the District in Rockland

County at 640 Oak Tree Road, Palisades, New York 10964.  Upon information and belief,

Defendant Palisades Gardens Group, LLC is a New York corporation doing business in the

District.  Upon information and belief, The Esplanade at Palisades has approximately 94 rental

apartments.

       16.     Upon information and belief, Defendant Esplanade Staten Island, LLC is

the owner and lessor of The Esplanade Staten Island, which is located at 1415 Richmond

Avenue, Staten Island, New York 10314.  Upon information and belief, Defendant Esplanade

Staten Island, LLC is incorporated in and conducts business in the State of New York.  Upon

information and belief, The Esplanade Staten Island has approximately 143 rental apartments.

       17.     Upon information and belief, Defendant Esplanade Chestnut, LLC is the

owner and lessor of the premises, which is located in the District in Rockland County at 168 Red

School House Road, Chestnut Ridge, New York 10977.  Upon information and belief, Defendant

Esplanade Chestnut, LLC is a New York corporation doing business in the District.

       18.     Defendant Chestnut Operating Company, LLC leases the premises, which

is located at 168 Red School House Road, Chestnut Ridge, New York 10977, and operates The

Esplanade at Chestnut Ridge on said premises.  Upon Information and belief, Defendant

Chestnut Operating Company, LLC is a New York corporation doing business in the District.

Upon information and belief, The Esplanade at Chestnut Ridge has approximately 91 rental

apartments.

       19.     As owner and lessor, Defendant Esplanade Chestnut, LLC, retains control

over lessee Defendant Chestnut Operating Company, LLC's operation of The Esplanade at

Chestnut Ridge.   At least one of the individual members of each of the limited liability

corporations that own and operate The Esplanade at Chestnut Ridge is a member of the Laufer

family.

20.      The lease agreement between Defendant Esplanade Chestnut, LLC and Defendant Chestnut Operating Company, LLC specifies that Defendant Esplanade Chestnut, LLC retains the right to terminate the lease upon 90 days notice and that both parties "agree[] to comply with all regulations of New York State Department of Health and any other agency having regulatory control over either party."

21.      Upon information and belief, as set forth below, Defendant Chestnut Operating Company, LLC has failed to comply with the regulations of the New York State Department of Health and other agencies having regulatory control over Defendant Chestnut Operating Company, LLC that prohibit discrimination on the basis of disability.

## FACTUAL ALLEGATIONS

**Background - The Esplanade Residences**

22.      Defendants all publish information about and advertise the locations, amenities, apartment floor plans, and common family-owned operation of The Esplanade Manhattan, The Esplanade White Plains, The Esplanade at Palisades, The Esplanade at Chestnut Ridge, and The Esplanade Staten Island (collectively, "The Esplanade Residences") on the same website – www.esplanadesenior.com.

23.      This website describes The Esplanade Residences "as a 'new home' where seniors can enjoy all the freedom of an independent lifestyle, with none of the worries that accompany household management."

24.      This website refers to The Esplanade Residences as being "family-owned" by "the Scharf Family."

25.     Defendant Esplanade Venture Partnership maintains a website at http://www.esplanademanhattan.com, Defendant Esplanade Chestnut LLC and/or Defendant Chestnut Operating Company, LLC maintains a website at www.esplanadechestnutridge.com, and Defendant Palisades Gardens Group, LLC maintains a website at www.esplanadeatpalisades.com.  These three websites provide information about The Esplanade Manhattan, The Esplanade at Chestnut Ridge, and The Esplanade at Palisades, respectively.

26.     The website for The Esplanade at Chestnut Ridge states that Chestnut Ridge is "personally managed and owned by the Scharf and Laufer families."

27.     Defendants all use the same four-page general information print brochure describing "The Esplanade Lifestyle" and providing information about The Esplanade Residences.

28.     Upon information and belief, all The Esplanade Residences include independent living apartments within a common physical structure akin to an apartment complex or hotel where people may participate in communal meals and activities, but live independently in separate apartments.

29.     Defendants provide rental agreements for individual apartments at The Esplanade Residences.  The rental price of each apartment includes meals and non-medical services, such as apartment cleaning services, transportation, and recreational activities.

30.     Medical services and assistance with activities of daily living are available at The Esplanade Residences only through other third-party providers, at an extra charge.

31.     For example, upon information and belief, the Hudson Valley Assisted Living Program provides assisted living services to some residents at The Esplanade at Chestnut Ridge.

32.     At nursing homes and other facilities that are licensed by the New York State Department of Health ("DOH"), subjecting applicants to detailed health inquiries may be legally justifiable.  Upon information and belief, the independent living apartments at The Esplanade Residences are not, however, DOH-licensed units.  None of the apartments at The Esplanade Manhattan, The Esplanade White Plains, The Esplanade at Palisades, and The Esplanade Staten Island, are licensed by the DOH or any other relevant state agency such as: an adult care facility, as that term is defined by Section 2(21) of the New York Social Services Law (NYSSL); an adult home, as that term is defined by Section 2(25) of the NYSSL; an intermediate care facility, as that term is defined by Section 2(30) of the NYSSL; an assisted living residence or assisted living, as those terms are defined by Section 4651(1) of the New York Public Health Law (NYPHL); a hospital, as that term is defined by Section 2801(1) NYPHL; a nursing home, as that term is defined by Section 2801(2) of the NYPHL; or a residential health care facility, as that term is defined by Section 2801(3) of the NYPHL.

33.     The Esplanade Residences are dwellings as defined by Section 802(b) of the Fair Housing Act to include "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

34.     The Esplanade Residences are housing accommodations, as defined by Article 15, § 292(10) of the New York State Human Rights Law and § 8-102(10) of the New York City Administrative Code to include "any building . . . which is used or occupied . . . as the home, residence or sleeping place of one or more human beings."

**Defendants' Discriminatory Statements and Advertising**

35.     In general, the use of human models in advertising personalizes the advertisements and encourages consumers to identify themselves in a positive way with the

models and housing featured.

36.    During the past nine months, and including April and May of 2013, FHJC staff reviewed the various Esplanade websites, brochures given to testers, and other marketing materials.  FHJC observed that human models are used in these print and on-line formats to represent actual or potential residents, or the type of potential residents that The Esplanade Residences have targeted as desirable occupants.  As described in greater detail below, the more than 200 human models used by Defendants to depict residents are all white.  In sharp contrast, the human models used by Defendants to depict staff include non-white and white human models.  To the ordinary reader, the repeated and continued depiction of only white human models as residents indicates an impermissible racial preference by Defendants for white residents.

37.    Defendants jointly operate the website described above, containing human models used to depict residents and others at the five senior communities.  Since at least September 2012, all of the human models on Defendants' joint website have been white.  Upon information and belief, the only exception to this pattern has been a photograph of one younger African American man pouring a beverage for an elderly white man seated at a dining table.

38.    Defendants give a brochure describing The Esplanade Residents to prospective residents who visit the five communities, including to FHJC testers.  Defendants' promotional brochure contains human models used to depict residents of The Esplanade Residences.  Since at least September 2012, the brochure has contained more than 15 such human models and all of them have been white.

39.    The website maintained by Defendant Esplanade Chestnut, LLC contains human models used to depict residents of The Esplanade at Chestnut Ridge.  Since at least

September 2012, the website has contained more than 40 such human models and all of them have been white.

40.     The website maintained by Defendant Palisades Gardens Group, LLC contains human models used to depict residents of The Esplanade at Palisades.  Since at least September 2012, the website has contained more than 55 such human models and all of them have been white.

41.     The website maintained by Defendant Esplanade Venture Partnership contains human models used to depict residents of The Esplanade Manhattan.  Since at least September 2012, the website has contained more than 75 such human models and all of them have been white.

42.     In a New York Times article, an employee of The Esplanade Manhattan referred to life at that residence as "the Jewish hotel experience."

43.     During 2012, employees at The Esplanade Manhattan, The Esplanade White Plains, and The Esplanade at Palisades orally inquired about the religion of prospective residents and pointed out that the vast majority of residents were Jewish.

**Defendants' Discriminatory Policies Against People Who Use Wheelchairs**

44.     All of The Esplanade Residences have elevators.

45.     The Esplanade Manhattan refuses to rent to prospective residents who use wheelchairs.

46.     The Esplanade Manhattan requires current residents who start using wheelchairs after they become residents to eat in a separate dining room from residents who do not use wheelchairs.

47.     The Esplanade Manhattan, The Esplanade Staten Island and The Esplanade at Palisades refuse to rent to prospective residents who use motorized wheelchairs.

48.     The Esplanade at White Plains, The Esplanade Staten Island, and The Esplanade at Chestnut Ridge refuse to rent to prospective residents who use wheelchairs and cannot transfer in and out of the wheelchair independently.

49.     The Esplanade at Chestnut Ridge will not rent to prospective residents who use wheelchairs if there is not an available apartment on the first floor of the residence.  The exclusionary effect of this limitation is reinforced by the fact that The Esplanade at Chestnut Ridge gives priority for first floor apartments to current residents, regardless of their mobility. Thus, a prospective resident who uses a wheelchair would be able to rent an apartment only if there is a first floor apartment vacant and a current resident on the second floor does not wish to move to the first floor.

**Defendants' Discriminatory Application Process**

50.     Defendants use a uniform application process to lease apartments at The Esplanade Residences.

51.     Defendants' application process includes inquiries into a prospective resident's disability and religion.

52.     Before a prospective resident can lease an apartment, Defendants require a prospective resident to complete an application packet.

53.     Defendants' application packet includes medical forms that have to be completed by a doctor.

54.     A sample application and move-in packet provided to one of the FHJC's testers included a Healthcare Information Form, a Physician's Report, and a Health Insurance

Portability and Accountability Act (HIPAA) release form.

55.     Defendants require the submission of a medical release form, and a prospective resident will not be considered for housing unless he or she submits it.

56.     Defendants use these medical forms to obtain information about whether a prospective resident has a disability, and, if so, the extent of that disability.

57.     Defendants base their decisions about whether or not to rent to prospective residents on the information contained in the completed medical forms.

58.     Defendants provide prospective tenants with a Residency Service Agreement, which states, "Admission Criteria:   The parties to this agreement understand that The Esplanade is a residential facility providing lodging, board, and housekeeping services. Provider may refuse to admit or retain Resident if in Provider's sole judgment, Resident is not physically, mentally, or emotionally able to reside in facility."

59.     In their application packet, Defendants also inquire about the religion of a prospective resident.

60.     The Resident Background Form, which is part of the Defendants' application packet, requires prospective residents to disclose their religion and whether they are "practicing."

**The FHJC's Investigation of The Esplanade Residences**

61.     In September 2012, the FHJC received a complaint, alleging that The Esplanade Staten Island was refusing to rent to people because of disability.

62.     In response to this complaint, the FHJC conducted an investigation.

63.    The FHJC gathered and reviewed background information regarding The Esplanade Residences from numerous sources, including their websites, brochures, and other print and internet-based promotional materials.

64.    The background information included a series of letters that were published in The Staten Island Advance during August and September 2012.

65.    On approximately August 28, 2012, The Staten Island Advance published a letter in which a person alleged that "wheelchair-users are not allowed to live [at The Esplanade Staten Island] at all, AND cannot even visit the residents there overnight."

66.    On approximately September 2, 2012, The Staten Island Advance published a letter by an employee of The Esplanade Staten Island.

67.    Instead of denying the allegation, the employee of The Esplanade Staten Island wrote: "The Esplanade is a community catering to active independent senior residents. The Esplanade is not an assisted-living facility.  As such, our residents are ambulatory and do not require the use of wheelchairs."

68.    Based on the complaint and the background investigation, the FHJC conducted a testing investigation at The Esplanade Residences from November 2012 through February 2013.

69.    As part of the FHJC's testing investigation, testers made telephone calls to each of The Esplanade Residences to gather preliminary information, and then two assigned testers visited each location posing as individuals seeking housing that would provide independent living for an elderly relative.  One of these testers inquired on behalf of a nondisabled relative, and the other tester inquired on behalf of a relative with disabilities who uses a wheelchair.

70.    Audio recordings were made of contacts between the testers and agents for The Esplanade Residences.

**Testing at The Esplanade Manhattan**

71.    On approximately November 15, 2012, the FHJC had JD, a female tester, call The Esplanade Manhattan, to inquire about an apartment for her mother.  JD was told that "Marcy" could give her information on pricing and touring the building.  Upon information and belief, "Marcy" is Marcy Salwen Levitt, who is the Executive Director of The Esplanade Manhattan.  During the telephone call, JD spoke to Ms. Levitt and told her that she was calling about her mother.  Ms. Levitt said that The Esplanade Manhattan is basically independent living so everyone coming in has to be "ambulatory, cognitively alert."  When JD inquired what Ms. Levitt meant by "ambulatory," Ms. Levitt told her that a person cannot use a wheelchair or scooter.  JD told Ms. Levitt that her mother uses a wheelchair, and Ms. Levitt confirmed that her mother could not live at The Esplanade Manhattan.  Ms. Levitt did not offer to show JD or her mother any apartments.

72.    On approximately November 28, 2012, the FHJC had SD, a male tester, visit The Esplanade Manhattan, to inquire about an apartment for his father.  SD was introduced to Joan Weiss, who is the Director of Marketing for The Esplanade Manhattan.  After asking how old SD's father is, Ms. Weiss asked SD whether his father is "ambulatory" and "cognitively alert."  After SD indicated that his father is ambulatory and cognitively alert, Ms. Weiss explained that The Esplanade Manhattan is "independent living" and reiterated that his father would have to be ambulatory and cognitively alert.  SD again assured Ms. Weiss that his father was, and the conversation proceeded.  SD asked to see an apartment, and Ms. Weiss gave him her card and invited him to call her for an appointment to be shown an apartment.

73.     During this visit, Ms. Weiss noted that the food at The Esplanade Manhattan is kosher, and she asked SD whether he is Jewish.  When SD responded that he is Jewish, Ms. Weiss told him that the owners are kosher, the dining room is kosher, and the residents are predominantly Jewish.

74.     SD and Ms. Weiss exchanged telephone messages later in the day to schedule another visit to The Esplanade Manhattan on November 29, 2012.  During this visit, Ms. Weiss asked SD a number of questions about his father's health, including if he is "fully functioning," whether he cooks for himself, and whether he still drives.  Ms. Weiss then showed SD the dining room, a one-bedroom apartment, a studio apartment, and the library.  While giving him a tour, Ms. Weiss reiterated that The Esplanade Manhattan is "independent living," and she asked whether SD's father uses a walker. Ms. Weiss also explained that SD's father and his doctor would have to fill out a form.  Before SD left, she encouraged SD to set up an appointment for his father to come to The Esplanade Manhattan for lunch.

75.     Earlier that same day, the FHJC had MD, a female tester, visit The Esplanade Manhattan, to inquire about an apartment for her sister.  After introducing herself, Ms. Weiss asked how old MD's sister was.  When MD said that her sister was 65, Ms. Weiss expressed skepticism that someone who was 65 would need "independent living for seniors." When MD noted that her sister uses a wheelchair, Ms. Weiss explained to MD that her sister could not live at The Esplanade Manhattan because prospective residents cannot use a wheelchair.  MD explained that her sister is independent, but Ms. Weiss said that The Esplanade Manhattan was not the right environment for MD's sister and suggested that she look for "supportive housing."  When MD protested, Ms. Weiss explained that The Esplanade Manhattan does not take prospective residents who use wheelchairs because "you have to be ambulatory and

cognitively alert."  Ms. Weiss insisted that, "to qualify as independent, you have to come in

vertical, ambulatory."  Although some current residents use wheelchairs because they have aged

in place, Ms. Weiss explained, "We don't even allow wheelchairs in the dining room."  Ms.

Weiss told MD that residents who use wheelchairs eat in a separate room with their aides.  When

MD asked why those residents are segregated, Ms. Weiss explained that that is "the rule" at The

Esplanade Manhattan because "it depresses the elderly" and "they don't want to see [residents

using wheelchairs]."  Before ending the conversation, Ms. Weiss suggested that MD contact the

"office of the aging" to find out about "handicap housing" for her sister.

**Testing at The Esplanade White Plains**

76.     On approximately September 15, 2012, the FHJC had BT, a female tester,

call The Esplanade White Plains and speak to Doron Kathein.  Upon information and belief, Mr.

Kathein is the Director of Marketing and Community Relations at The Esplanade White Plains.

BT presented herself as a woman searching for an apartment to rent on behalf her mother.  Mr.

Kathein told BT that her mother's physician would have to complete a report as an initial

assessment.  Mr. Kathein told BT that they may determine that her mother does not fit into the

residence; in that case, they would refund any deposits already paid and refer her to a nursing

home.  At that point, BT told Mr. Kathein that her mother uses a wheelchair.  Mr. Kathein asked

if she needs helpers or could move herself, and BT responded that her mother could move

herself.  Mr. Kathein also asked how old her mother was, and BT responded that she was 75

years old.  Mr. Kathein asked BT again if her mother needs help bathing and grooming, and BT

repeated that she is able to move and groom herself.  BT told Mr. Kathein that she would call

back to schedule a visit.

77.     On approximately December 5, 2012, the FHJC had LD, a female tester, call The Esplanade White Plains to inquire about an apartment for her father.  LD spoke to "Gail" and set up an appointment to visit the next day.  Upon information and belief, "Gail" is Gail Sterling, the Assistant Director of Marketing at The Esplanade White Plains.

78.     On approximately December 6, 2012, LD arrived at The Esplanade White Plains to meet with Ms. Sterling.  Sterling asked how old LD's father was and then, when she found out he was 74, commented that he was young.  Ms. Sterling asked LD why her father needed or wanted to move, and LD said that he was healthy and ambulatory but had some hearing loss and was moving more slowly with age.  Ms. Sterling asked LD where her mother was living currently.  When LD responded that her mother had passed away, Ms. Sterling asked LD if her father was depressed.  LD responded that he was not depressed.  Ms. Sterling asked LD about her father's support system and told LD that she was trying to figure out why he wanted to move since he was in good health and young.  Ms. Sterling asked LD if her father was under a physician's care or on any medications.  When LD responded that he was not sure, Ms. Sterling said she would have to know more about his health status to see what The Esplanade White Plains could offer him.

79.     During this visit, Ms. Sterling asked LD about her father's religious background.  When LD responded that her father does not have a religion, Ms. Sterling told LD that "everyone has a religion."  LD responded that neither she nor her father were brought up with or currently has a religion.  Ms. Sterling asked if her father is an atheist, and LD responded that she supposed so.

80.     During this visit, LD asked Ms. Sterling about the application process. Ms. Sterling told LD that the medical information is the most important part and they also need

information on who, if anyone, is the executor of a will and the healthcare proxy. Ms. Sterling told LD that they keep the deposit until the medical information is made available. Ms. Sterling showed LD an apartment for which another applicant had put down a deposit but had not submitted his or her medical forms. Ms. Sterling told LD that not receiving the medical forms is a red flag and the apartment was therefore available.

81.    On approximately December 14, 2012, the FHJC had MG, a male tester, call Mr. Kathein to inquire about an apartment for his mother. They set up an appointment for later that same day.

82.    At approximately 2:00 p.m., MG arrived at The Esplanade White Plains and met with Mr. Kathein. Mr. Kathein asked MG how old his mother was, and MG responded that she was 72 years old. Mr. Kathein asked MG if his mother drives, and MG responded that she does not and that she has had multiple sclerosis for most of her life. MG told Mr. Kathein that his mother uses a wheelchair but is able to transfer herself independently, which Mr. Kathein said means "self-propelled." Mr. Kathein told MG that as long as his mother is "self-propelled," that would be acceptable.

83.    Mr. Kathein told MG that his mother's physician would have to complete a medical form. Mr. Kathein told MG this is the first step in the assessment of a prospective resident, even before financial information.

**Testing at The Esplanade at Palisades**

84.    On approximately November 15, 2012, the FHJC had BT, a female tester, call The Esplanade at Palisades to inquire about an apartment for her mother. She asked to speak to a leasing agent, and, after she was put on hold, a woman name "Joyce" came on the line. Upon information and belief, "Joyce" is Joyce Rogers, MSW, LSCW, who is the Director of

Marketing at The Esplanade at Palisades.  After asking BT how old her mother was, Ms. Rogers asked BT whether her mother needs assistance.  BT said that her mother needs help only with meals and laundry.  Ms. Rogers explained that she needed information about BT's mother to determine if BT's mother was "appropriate for us."  After BT noted that her mother uses a wheelchair, Ms. Rogers asked BT again whether her mother needed assistance.  Ms. Rogers said that if BT or her mother wanted to see apartments, she should call again.

85.     On approximately January 4, 2013, the FHJC had BC, a female tester, call Ms. Rogers to inquire about an apartment for her sister.  They set up an appointment for later that same day.

86.     At approximately 1:30 p.m., BC arrived at The Esplanade at Palisades and met with Ms. Rogers.  BC explained that she was looking for an apartment for her sister, who was 80 years old.  Ms. Rogers asked BC if her sister has any assistance, whether she has a cognitive impairment, and whether she uses support or a walker.  After BC told Ms. Rogers that her sister was generally healthy, Ms. Rogers gave her a tour of The Esplanade at Palisades.  During the tour, they passed by someone whose mother-in-law was moving out that day.  Ms. Rogers explained that the person could "no longer be able to be with us" because "if skilled nursing is needed and requested, then someone moves out."  Ms. Rogers told BC that only two current residents use wheelchairs.  Ms. Rogers, who is a social worker, told BC that, if BC's sister was interested in living at The Esplanade at Palisades, Ms. Rogers would conduct a "psycho-social" examination on her.  At the end of the tour, Ms. Rogers explained that the application packet includes two forms that her sister's doctor would have to fill out.

87.     On approximately January 8, 2013, the FHJC had NH, a male tester, visit The Esplanade at Palisades to inquire about an apartment for his mother.  NH met with Ms.

Rogers.  NH explained that his mother was 79, in good health, and she uses a wheelchair.  Ms. Rogers declared that, based on the owners' decision, "power" wheelchairs are not allowed at The Esplanade at Palisades.  Ms. Rogers inquired about his mother's religion, and said that it is "no problem" when NH said that his mother is Protestant.  At the end of the tour, Ms. Rogers explained that the application packet includes some forms that his mother's doctor would have to fill out as well as a health care proxy form.

88.     During both tours, Ms. Rogers noted that The Esplanade at Palisades is kosher and that one-third of the residents are not Jewish.

**Testing at The Esplanade at Chestnut Ridge**

89.     On approximately November 13, 2012, the FHJC had KH, a female tester, call The Esplanade at Chestnut Ridge.  KH presented herself as a woman looking for an apartment for her mother.  KH told the receptionist that she is looking for an independent living apartment for her mother, and the receptionist transferred her to "Debbie."  Upon information and belief, "Debbie" is Debbie Corwin, the Director of Community Relations at The Esplanade at Chestnut Ridge.  KH said that she wanted independent senior housing for her mother and asked if Chestnut Ridge was assisted living.  Debbie responded that as long as her mother did not want to cook her own food, she could live here.

90.     When KH mentioned that her mother uses a wheelchair, Ms. Corwin asked if she could bear weight and move around.  KH responded that she could.  Ms. Corwin stated that, nonetheless, her mother would be limited to apartments on the first floor because, although The Esplanade at Chestnut Ridge has an elevator, it requires any resident who uses a wheelchair to live on the first floor in case of emergencies.  Ms. Corwin remarked that this

would restrict KH's mother's options.  Ms. Corwin stated that if KH's mother was serious about moving soon, she should arrange a time to visit The Esplanade at Chestnut Ridge.

91.     On approximately December 17, 2012, the FHJC sent PH, a female tester, to The Esplanade at Chestnut Ridge.  PH presented herself as a woman looking for an apartment for her older sister.  PH met with Ms. Corwin.  Ms. Corwin asked PH if her sister could walk, and PH responded that, yes, she could walk.  Ms. Corwin said that she was asking because of availability.  Ms. Corwin explained that there are two hallways, one short and one long, so the sister would have to be able to walk both distances.  PH asked if residents with different levels of need live in close proximity to each other.  Ms. Corwin responded that the only time The Esplanade at Chestnut Ridge will move a resident is if the resident lives on the second floor and then develops the need for a wheelchair.  In that case, The Esplanade at Chestnut Ridge requires the resident to move to an apartment on the first floor.  Ms. Corwin told PH that more apartments would be available for her sister because she does not use a wheelchair.

92.     On approximately December 18, 2012, the FHJC had BT, a female tester, call Ms. Corwin to inquire about an apartment for her mother.  They set up an appointment for the next day.

93.     On December 19, 2012, BT arrived at The Esplanade at Chestnut Ridge to meet with Ms. Corwin.  BT told Ms. Corwin that her mother uses a wheelchair but is able to transfer.  Ms. Corwin said that The Esplanade at Chestnut Ridge does not rent to people who use wheelchairs and are unable to transfer.  Ms. Corwin said that people who use wheelchairs and can transfer may rent apartments, but only on the first floor.  Ms. Corwin explained that this is the policy even though The Esplanade at Chestnut Ridge has an elevator.  Ms. Corwin remarked that first floor apartments are more desirable and less available, because The Esplanade at

Chestnut Ridge gives priority to current residents—even those who do not use wheelchairs—who want to move to the first floor over any prospective resident.  Later during this same visit, Ms. Corwin commented that when "independent people" come into the residence and see people using wheelchairs or walkers, they are often immediately concerned and "put off."

94.     Towards the end of the visit, BT asked Ms. Corwin about the application, and Ms. Corwin responded that there is not an application but rather forms that need to be filled out by her mother's doctors.  Ms. Corwin stated that these forms are standard in New York State and known as "3122 forms."

95.     Upon information and belief, Ms. Corwin was referring to the New York State Department of Health Assisted Living Residence Medical Evaluation form ("DOH-3122") or a comparable form.  The DOH-3122 asks for detailed information regarding the applicant's diagnoses, continence, ability to ambulate, cognitive impairment, and mental health.

96.     On approximately March, 6, 2013 the FHJC had SS, a female tester, call The Esplanade at Chestnut Ridge to inquire whether it is assisted or independent living.  SS spoke to a woman named "Alicia" who indicated that Chestnut Ridge included both by stating that "everyone is together, whether assisted or independent living."

**Testing at The Esplanade Staten Island**

97.     On approximately December 5, 2012, the FHJC had BH, a male tester, call The Esplanade Staten Island to inquire about an apartment for his father.  BH spoke with "Patrice," and they set up an appointment for the same day.  Upon information and belief, "Patrice" is Patrice Ficco, the Marketing Director at The Esplanade Staten Island.

98.     At approximately 1:00 p.m., BH arrived and met with Ms. Ficco.  At the end of the visit, BH asked about the application process.  Ms. Ficco said there is no application,

but rather a lease and other forms, and then those forms are reviewed on a case-by-case basis. Ms. Ficco offered to mail a sample move-in packet to BH.  At a later date, Ms. Ficco mailed a move-in packet to BH.

99.     On approximately December 13, 2012, the FHJC had KH, a female tester, call The Esplanade Staten Island to inquire about an apartment for her mother.  BH spoke with "Patrice," and they set up an appointment for the same day.

100.    Later that same day, KH arrived at The Esplanade Staten Island and also met with Ms. Ficco.  Ms. Ficco told KH that seniors in The Esplanade are "independent" and "ambulatory."  Ms. Ficco went on to say that the seniors can use canes, walkers, or wheelchairs; ambulatory means that they can "get back and forth to the dining room."  At that point, KH said her mother uses a wheelchair but is able to transfer.  Ms. Ficco said that should be acceptable. Ms. Ficco told KH that The Esplanade Staten Island requires physicians' reports from potential residents during the application process.  Ms. Ficco stated that these reports are reviewed by nurses from Senior Home Care, a company The Esplanade contracts with for services not included in the monthly rent.  Ms. Ficco told KH that the nurses are primarily looking for conditions that require hourly care or present difficulties if residents are non-compliant in treatment, such as diabetes.  Ms. Ficco did not offer to mail a sample move-in packet to KH.

101.    During this visit, Ms. Ficco told KH that The Esplanade Staten Island does not allow motorized wheelchairs.  Ms. Ficco said this is because many of the residents use walkers or canes, and someone in a motorized wheelchair moves very fast, creating a safety concern for The Esplanade.   Ms. Ficco told KH that, additionally, some motorized wheelchairs are larger than others and this causes some residents to not be able to see around the person.

102.   Ms. Ficco informed both testers that, within The Esplanade Staten Island, there is a gym run by Fox Rehabilitation, a physical therapy group.  Ms. Ficco stated that Fox Rehabilitation evaluates residents and that they are not permitted to exercise on their own.  Ms. Ficco told KH, "We can't let them just go to the gym and exercise on their own unless they're much younger or we know that they don't have any ambulatory issues."

## COUNT I
Fair Housing Act:
Discrimination based on Disability
(42 U.S.C. § 3601 *et seq.*)

103.   Plaintiff repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

104.   Defendants own and lease dwellings, as defined by Section 802(b) of the Fair Housing Act, 42 U.S.C. § 3602(b), to include "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

105.   Defendants' conduct, as described above, constitutes making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on disability, in violation of Section 804(c) of the Fair Housing Act, 42 U.S.C. § 3604(c).

106.   Defendant Esplanade Venture Partnership's, Defendant Esplanade Chestnut, LLC's, and Defendant Chestnut Operating Company, LLC's conduct, as described above, constitutes representations made because of disability that a dwelling is not available for inspection or rent when such dwelling was in fact so available, in violation of Section 804(d) of the Fair Housing Act, 42 U.S.C. § 3604(d).

107.    Defendants' conduct, as described above, constitutes discrimination in the rental, or to otherwise make unavailable or deny, a dwelling to a renter because of disability, in violation of Section 804(f)(1) of the Fair Housing Act, 42 U.S.C. § 3604(f)(1).

108.    Defendants' conduct, as described above, constitutes discrimination against any person in the terms, conditions, or privileges of rental of a dwelling because of disability, in violation of Section 804(f)(2) of the Fair Housing Act, 42 U.S.C. § 3604(f)(2).

109.    Plaintiff is an aggrieved person as defined in 42 U.S.C. § 3602(i). Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

110.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

111.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT II**
Fair Housing Act:
Discrimination based on Religion
(42 U.S.C. § 3601 *et seq*.)

112.    Plaintiff repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

113.    Defendants own and lease dwellings, as defined by Section 802(b) of the Fair Housing Act, 42 U.S.C. § 3602(b), to include "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

114.    Defendants' conduct, as described above, constitutes making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement,

with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination

based on religion, in violation of Section 804(c) of the Fair Housing Act, 42 U.S.C. § 3604(c).

115.    Plaintiff is an aggrieved person as defined in 42 U.S.C. § 3602(i).

Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a

result.

116.    Defendants' conduct was intentional, willful, and made in disregard for

the rights of others.

117.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiff is entitled to actual

damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

118.    Plaintiff is an aggrieved person as defined in 42 U.S.C. § 3602(i).

Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a

result.

119.    Defendants' conduct was intentional, willful, and made in disregard for

the rights of others.

120.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiff is entitled to actual

damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### COUNT III
Fair Housing Act:
Discrimination based on Race or Color
(42 U.S.C. § 3601 *et seq.*)

121.    Plaintiff repeats and realleges the foregoing paragraphs of its complaint as

though fully set forth herein.

122.    Defendants own and lease dwellings, as defined by Section 802(b) of the

Fair Housing Act, 42 U.S.C. § 3602(b), to include "any building, structure, or portion thereof

which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

123.    Defendants' conduct, as described above, constitutes making, printing, or publishing, or causing to be made, printed, or published, a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on race or color, in violation of Section 804(c) of the Fair Housing Act, 42 U.S.C. § 3604(c).

124.    Plaintiff is an aggrieved person as defined in 42 U.S.C. § 3602(i). Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

125.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

126.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

127.    Plaintiff is an aggrieved person as defined in 42 U.S.C. § 3602(i). Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

128.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

129.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT IV**
New York State Human Rights Law:
Discrimination based on Disability, Religion, Race, and Color
(New York Executive Law § 296 *et seq*.)

130.    Plaintiff repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

131.    Defendants own and lease housing accommodations, as defined by Article 15 of the New York Executive Law Section § 292(10) to include "any building . . . which is used or occupied . . . as the home, residence or sleeping place of one or more human beings."

132.    Defendants' conduct, as described above, constitutes refusing to rent or lease, or otherwise denying or withholding a housing accommodation or the representation that a housing accommodation is not available for inspection, rental, or lease when in fact it is so available, based on disability in violation of Article 15 of the New York Executive Law § 296(5)(a)(1).

133.    Defendants' conduct, as described above, constitutes discrimination in the terms, conditions or privileges of rental or lease of a housing accommodation or in the furnishing of facilities or services in connection therewith based on disability in violation of Article 15 of the New York Executive Law § 296(5)(a)(2).

134.    Defendants' conduct, as described above, constitutes printing or circulating or causing to be printed or circulated a statement, advertisement, publication, or using a form of application for rental, or making a record or inquiry in conjunction with a prospective rental, which expresses, directly or indirectly, a limitation, specification, or discrimination, or an intent to make such limitation, specification, or discrimination based on disability, religion, race, and color in violation of Article 15 of the New York Executive Law § 296(5)(a)(3).

135.    Plaintiff has been injured by the Defendants' discriminatory conduct and has suffered damages as a result.

136.    The Defendants' conduct was intentional, willful, and made in reckless disregard for the rights of others.

137.    Accordingly, under Article 15 of the New York Executive Law § 297, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**<u>COUNT V</u>**
New York City Human Rights Law:
Discrimination based on Disability, Religion, Race, and Color
(New York Administrative Code § 8-107 *et seq*.)

138.    Plaintiff repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

139.    Defendant Esplanade Staten Island, LLC and Defendant Esplanade Venture Partnership (collectively, "NYC Esplanade Defendants")  own and lease housing accommodations, as defined by Section 8-102(10) of the New York City Administrative Code to include "any building . . . which is used or occupied . . . as the home, residence or sleeping place of one or more human beings."

140.    NYC Esplanade Defendants' conduct, as described above, constitutes refusing to rent or lease, refusing to approve the rental or lease, or otherwise denying or withholding a housing accommodation because of disability, in violation of New York Administrative Code § 8-107(5)(a)(1).

141.    NYC Esplanade Defendants' conduct, as described above, constitutes discrimination in the terms, conditions, or privileges of the rental of a housing accommodation because of disability, in violation of New York Administrative Code § 8-107(5)(a)(2).

142.   NYC Esplanade Defendants' conduct, as described above, constitutes declaring, printing, or circulating a statement, advertisement, publication, or using a form of application for rental, or making a record or inquiry in conjunction with a prospective rental, which expresses, directly or indirectly, a limitation, specification, or discrimination, or an intent to make such limitation, specification, or discrimination based on disability, religion, race, and color in violation of New York Administrative Code § 8-107(5)(a)(3).

143.   Plaintiff has been injured by NYC Esplanade Defendants' discriminatory conduct and has suffered damages as a result.

144.   NYC Esplanade Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

145.   Accordingly, under the New York Administrative Code § 8-502(a) and (f), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

146.   Plaintiff has served a copy of the complaint upon the City Commission on Human Rights and Corporation Counsel, pursuant to the New York City Administrative Code § 8-502(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

(a) Declaring that Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq*., the New York State Human Rights Law, New York Executive Law § 290 *et seq*.; and the New York City Human Rights Law, New York Administrative Code § 8-107 *et seq*.

(b) Enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation from discriminating on the basis of disability, religion and race, including the following,

    (i) Denying or withholding housing or otherwise making housing unavailable;

    (ii) Representing to any person that a dwelling is not available for inspection or rental when such dwelling is in fact so available;

    (iii) Discriminating in the terms, conditions, or privileges of rental; and

    (iv) Making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination.

(c) Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation to,

    (i) Make all necessary modifications to their policies, practices, and procedures to comply with fair housing laws;

    (ii) Train all management, agents, and employees on fair housing laws;

(iii)    Advertise apartments available for rent in a non-discriminatory manner, including displaying an Equal Housing Opportunity logo (or statement to that effect) on all print and internet advertisements and displaying in all offices and rental buildings appropriate fair housing law posters;

(iv)    Use human models on websites and in other marketing materials that depict residents of all races and with disabilities;

(v)    Allow monitoring of their application and rental process;

(vi)    Retain advertising and rental records to allow for appropriate monitoring;

(vii)    Develop written procedures on rental process and fair housing policy to be distributed to all employees, agents, tenants, and rental applicants; and

(viii)    Establish a system for testing agents and employees for unlawful discriminatory practices;

(d)    Awarding such damages to Plaintiff as will fully compensate for the diversion of resources and frustration of mission caused by Defendants' unlawful practices;

(e)    Awarding punitive damages to Plaintiff;

(f)    Awarding Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

(g)    Granting Plaintiff such other further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial on the merits by jury pursuant to Fed. R. Civ. P. 38.

Dated:  New York, New York
    October 2, 2013

         EMERY CELLI BRINCKERHOFF
         & ABADY LLP


        By: _____
          Diane L. Houk (DH 5202)

         75 Rockefeller Plaza, 20th Floor
         New York, New York 10019
         (212) 763-5000


         MFY LEGAL SERVICES, INC.


        By: _____/s/_____

         Kevin M. Cremin (KC-4319)
         Nahid Sorooshyari, of counsel to
         Jeanette Zelhof, Esq.

         299 Broadway, 4th Floor
         New York, NY 10007
         (212) 417-3759
         Email: kcremin@mfy.org

         *Attorneys for Plaintiff*